## UNITED STATES v. BOSS & PEAKE AUTOMOBILE CO. et al.

(District Court, D. Oregon. December 11, 1922.)

### No. L–8786.

1. **Internal revenue ⬅➡27(2)—As affecting liability for income tax, contract between stockholders held one of sale of stock.**

As affecting liability for income tax in suit by United States, a transaction between two persons, each of whom owned half the stock of a corporation, *held*, on conflicting testimony, to have been a sale by one of his stock to the other, and not an agreement for dissolution and division of assets; it appearing that the seller indorsed his stock, received payment, and at once resigned as officer and director, and that the buyer voted all the stock at a subsequent stockholders' meeting.

2. **Constitutional law ⬅➡188—Internal revenue ⬅➡2—Retrospective income tax law constitutional.**

The income tax provisions of War Revenue Act 1917, § 201 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6336⅞b), are not unconstitutional because they take effect as of January 1, 1917.

3. **Internal revenue ⬅➡27(2)—Liability for income tax on dissolved corporation.**

The owner of one half the stock of a corporation sold his stock to the owner of the other half, who, through such ownership, caused the cor-

poration to transfer all its assets to a partnership formed by him, thus dissolved it. *Held*, that income tax assessed against the corporation after its dissolution was a liability of the buyer and not of the seller of the stock.

4. Corporations ⟨⟩182—Liability of stockholder for assets withdrawn.

Mere depletion of assets of a corporation, unless accompanied by fraud, with a view of overreaching creditors, does not afford basis for an equitable action to recover against the party receiving the assets withdrawn.

In Equity. Suit by the United States against the Boss & Peake Automobile Company, C. L. Boss, and E. W. A. Peake. Decree for complainant against defendant Boss; dismissed as to defendant Peake.

Lester W. Humphreys, U. S. Atty., of Portland, Or., and Carl A. Mapes, Solicitor of Internal Revenue, and C. A. Gwinn, Atty. Treasury Department, both of Washington, D. C., for the United States.

John F. Logan and Isham N. Smith, both of Portland, Or., for defendant Boss.

Winter & Maguire and John F. Reilly, all of Portland, Or., for defendant Peake.

WOLVERTON, District Judge. This is a suit in behalf of the general government to recover one-half of the income tax assessed against the defendants Boss and Peake, as the shareholders in equal division of the Boss & Peake Automobile Company, a dissolved corporation. One-half of the tax, namely, $6,202.65, has been paid by the defendant Boss, and the other half remains due and unpaid. Boss, while not denying liability, claims that he has paid his full share of the tax, and that Peake should be required to pay the amount remaining due. Peake denies liability, on the ground that he was not a stockholder at the time of dissolution of the corporation, claiming that prior to dissolution he sold his entire stock to Boss, and that therefore Boss, being the owner of all the stock, should respond in payment of the entire tax. The cause can be disposed of with greater clarity by first ascertaining whether, as between Boss and Peake, the latter is liable; and, second, as between Peake and the government, whether he is liable with Boss for the payment of the tax.

[1] The Boss & Peake Automobile Company was organized and incorporated on November 8, 1916, with a capital stock of $30,000, divided into 300 shares, of $100 each. Of these shares Boss subscribed 149, Peake 149, and W. H. Bietau 2. Subsequently Bietau assigned one of her shares to R. E. Murphy. Bietau was the secretary of Peake, and Murphy became the bookkeeper for the corporation. These two were, however, mere holding stockholders, for giving voice at the meetings of stockholders and directors; the real ownership being in Boss, 1 share, and Peake, 1 share. In reality, Boss and Peake were equal owners of the capital stock; each owning 150 shares, and each having paid into the concern as capital investment the full par value of his stock.

The corporation at once entered upon the business for which it was organized, and so continued to June 1, 1917, when, or shortly there-

---

after, its assets were taken over by C. L. Boss Automobile Company. An income tax of $12,405.30 was levied upon the earnings of the company from January 1 to June 1, 1917; the earnings being appraised at $22,549.94. On or about May 21, 1917, Boss and Peake had an understanding between them, by which Peake was to dispose of his interest in the corporation to Boss, and the crucial inquiry as between them is whether the agreement was for a sale of Peake's stock to Boss, or for a dissolution of the corporation and a division of the assets of the concern. Peake maintains that it was for a sale, pure and simple, and Boss that it was for a dissolution, with division of the assets.

The parties were business men, were keenly alive to the promotion of the enterprise, and kept fairly in mind the probable earnings of their investment as the business proceeded. In their relative lines of work, Boss was concerned more in the purchase of cars from the manufacturers and the disposal of them in the field, and Peake with arrangement of the finances with which to conduct the business. Boss asserts that the matter of dissolution and division of assets was early a subject of discussion, and even at the time of forming the corporation, and that it was understood that the investments should be so managed and the business so ordered that such a settlement could at any time be readily arrived at; that in March, 1917, Peake made an offer to sell his stock, which was accepted by him (Boss), and that a paper was drawn up for effectuating the sale, but that Peake declined to sign it. The paper alluded to is in evidence, and is in the nature of an option for the sale of the stock upon an inventory basis; Boss to pay Peake 50 per cent. of the inventory value of the assets.

Boss further testifies that he and Peake had a conversation at the Central Depot in Portland relative to a dissolution of the corporation and a distribution of the assets between them. McCornack, the field manager of the Hudson Motor Car Company, had been in the city a short time, and had been in communication with Boss, but not with Peake. Boss and Peake were in rivalry as to which of them should be favored in getting the agency for handling the Hudson car. McCornack was about to leave the city, and had gone to the depot to take the train. Boss and McRell were with him. Peake, learning that McCornack was leaving, went to the depot to see him, and there had a short conversation with him, in which McCornack gave him to understand that he preferred to deal with Boss. Boss further relates that, immediately upon McCornack's taking the train, he (Boss) turned to Peake and remarked that "he was blocking our distribution, our dissolution and distribution, again, * * * by taking the cash of the corporation and putting it in notes that the bank was carrying"; that thereupon Peake said to him, "I will take notes, title notes on all the new Hudson cars, so that the distribution and dissolution can be completed; I will take the physical assets; I will take the automobiles of the corporation, and sell them to you boys, and take the title notes, and loan you boys the money on the very automobiles, so that the dissolution and distribution can be completed; * * * in doing so, I must have my salary, I must have my capital, and I must have my net prof-

it, which I estimate—the net profit I estimate to be $20,000," after allowing over $2,000 for profit and loss on the notes that were indorsed, the service on the cars that were out, and the incidental bills that were not in; and that this proposition as made by Peake was accepted by him (Boss), to take effect as of June 1st. This was May 21st, 22d, or 23d.

Boss further explains that, before meeting at the depot, the record was brought up, and showed a little over $22,000 profit, and that, after deducting the profit and loss on accounts unsettled, would leave approximately $20,000, one-half of which, namely, $10,000, would be Peake's share of the net profits, and that the amount claimed by Peake totaled $26,137, which included some chairs and a desk which belonged to him, individually. Further on, Boss says that "there was no capital stock ever sold; the capital stock was indorsed, at my request, as a means or a way; when we were down there, he made a proposition of dissolving and distributing, either in cash or kind, and his proposition was accepted"; that in the transfer he (Boss) was to take the liabilities, but that, as to the tax liability, he did not assume that, because it was not known, and was not a current liability.

R. J. McRell testified, respecting the conversation at the depot, that "Mr. Boss turned to Mr. Peake, and said that he was blocking the dissolution of the Boss & Peake Automobile Company, and Mr. Peake asked him how that was; and he said that he had taken the money of the corporation, and had put it into automobile notes, in other words, had used up the funds; * * * and Mr. Peake came back at him very quickly, and said that he would take the notes of the C. L. Boss Automobile Company; that is, he would loan money to the C. L. Boss Automobile Company, and take the new automobiles that were controlled by the Boss & Peake Automobile Company * * * as security for the loan—as I recall, there were eight automobiles, these eight Hudson automobiles—to apply on this loan; and he said that he must have his salary in the deal, and he must have his capital, and he must have his profit.; * * * they estimated, as I recall, their profits at $20,000, and the division of the two, of course, would be $10,000, divided between the two, that would be the division of profits"; that Boss accepted the proposition "very quickly right there," and that on June 1st, at the First National Bank, the deal was completed.

This is Boss' rendition of the nature of the agreement growing out of the conversation at the depot. Peake testifies, touching the transaction there had, that, before McCornack had departed, he called Boss off to one side, away from both McCornack and McRell, so they could talk privately; and "I asked—Mr. Boss' intention was to make me a proposition to go out on July 1st, and I asked Mr. Boss if he would be able to get his money together by June 1st. He said he would. 'Well,' I says, 'I will make you a price then. I will make you a price of $25,-000 for the stock,' and I would expect the salary credit to be paid. Mr. Boss says, 'That is perfectly satisfactory.' And we left at that, and that was all the conversation, and it didn't take any longer than I have taken in telling you now. * * * Absolutely nothing said about any adjustments of any kind. * * * The first I heard of an adjustment account was here."

Speaking of the earlier conversation, in March, alluded to by Boss, Peake says that he made no offer to sell to Boss on an inventory basis; that his proposition was to sell his stock in the company, and that he always expected to sell for a lump sum; that he assigned his stock in blank to Boss; that he at no time insisted or requested that the corporation be dissolved, and that he "really didn't know" that the corporation had been dissolved until the tax question arose in the summer of 1920.

This fairly presents the contentions of the parties respecting the nature of the transaction had between them at the depot. They differ radically, and the question must be determined upon the nature of their dealings subsequently and the manner in which the final adjustment was made. On May 31, 1917, Peake tendered to the board of directors and stockholders of the Boss & Peake Automobile Company his resignation as secretary and treasurer and director of such company. On the same day, at a stockholders' meeting, at which were present C. L. Boss, representing 298 shares, R. J. McRell, 1 share, and R. E. Murphy, 1 share, his resignation was accepted, and McRell was elected director in his stead. On June 1, 1917, Boss and McRell filed with the county clerk and ex officio recorder of Multnomah county a certificate declaring that they had entered into copartnership under the assumed name of C. L. Boss Automobile Company.

A bill of sale was executed by the Boss & Peake Automobile Company, through its president, C. L. Boss, and R. J. McRell, secretary, purporting to sell, assign, and convey all the property of the corporation to the C. L. Boss Automobile Company. The paper is without date, but it purports to have been acknowledged on July 3, 1917. At a meeting of stockholders held June 22, 1917, this bill of sale was ratified, as were all the acts and doings of Boss and McRell, individually and as officers of the corporation. At this meeting the corporation was declared to be dissolved.

The transactions which closed the agreement of May 21st took place on June 1, 1917, at the First National Bank in Portland. The C. L. Boss Automobile Company gave to Peake eight notes, each for the sum of $1,200, and each secured by a Hudson automobile, as per contracts which were subjoined to the notes. Thereupon Peake gave his check to the C. L. Boss Automobile Company for $9,600, which was delivered to Boss. Boss thereupon deposited the same in the bank to his account, together with $8,000 which he had borrowed from the Western Bond & Mortgage Company, and the further sum of $8,-537.15, which he obtained from the Boss & Peake Automobile Company on his note, making in all $26,137.15. Boss then gave Peake his check on the bank for that amount, and Peake assigned his stock, 149 shares, to Boss, and W. H. Bietau assigned 1 share to R. J. McRell, all in blank, and these were delivered to Boss. Thus all matters between Boss and Peake were settled and closed. Thenceforth Peake held the notes of the C. L. Boss Automobile Company in the sum of $9,600, secured as has been indicated. These notes were subsequently paid, as the cars were disposed of, presumably by the C. L. Boss Automobile Company.

The books and records of the Boss & Peake Automobile Company show that on June 1st the company gave to C. L. Boss its check for $8,537.15. This was one of the checks deposited in the bank to the account of Boss, to enable him to draw the check of $26,137.15 to the order of Peake. The book entries in the combined cash and journal show the following:

| | | | | |
|---|---|---|---|---|
| E. W. A. Peake, Cap. % | | | | $15,000.00 |
| Do. | Sal'y % | | | $ 1,079.17 |
| Do. | for Mah'y Desk & Chairs | | | 57.98 |
| Do. | as earnings 11/25 to 5/31 | | 10,000.00 | |
| C. L. Boss, by check, Cap. % | | | | $26,137.15 |

In the journal is found this entry:

| | | |
|---|---|---|
| Profit & L. | $10,000.00 | |
| Do. | 11,373.32 | |
| Interest per agreement E. W. A. Peake | | $10,000.00 |
| C. L. Boss. ½ profits | | 11,373.32 |

The evidence shows that a balance of $1,373.32 was passed to surplus account. It is further shown that the profits of the company on June 1st were $22,746.64. This does not seem to be controverted. These records, it is shown by Murphy, the bookkeeper, were not written up and posted until about the 19th day of June, but they were designed to record the transactions of the date of June 1st; the bookkeeper being unable, for lack of time, to insert the entries at the time the transactions took place.

Other entries that throw some light upon the subject of controversy are: One in the ledger showing that the surplus account of $1,373.32 was passed, to C. L. Boss $996.21, and to R. J. McRell $377.11; and two in the combined cash and journal, of date June 19, 1917, the first a charge, "Clearing a/c, $4,223.91," evidenced by check No. 2804; and the second, "Clearing a/c Tr. from B. & P. A. Co. to C. L. B. & Co. $4,223.91." The books of the Boss & Peake Automobile Company were not closed on June 1st, but were used by the C. L. Boss Automobile Company, and carried on as though there had been no suspension of business on the part of the corporation.

As to the item of $22,746.64, representing the profits of the corporation, Mr. Boss says it was "divided and held in abeyance to find out how much interest McRell would take in the business," and as to the surplus of $1,373.32, he says it was "credited to ourselves (meaning himself and McRell), because ourselves would absorb in the going business according to our percentages." He had reference to the percentages of capital each was to have in the copartnership. Boss further testifies that Peake had nothing to do with the business of the new company after he sold out, "after he took his distribution." Peake testifies that he never requested that the corporation be dissolved, and had nothing to do with the organization of the C. L. Boss Automobile Company, and never had any interest in it.

The evidence is too long and the books too prolix to attempt a particular analysis thereof. But, from what has been noted, we have a fairly accurate basis from which to formulate our conclusion touching the nature of the agreement or understanding of the parties, had at the

depot and subsequently brought to a close by the culmination at the bank. Boss and McRell agree in all material particulars as to the understanding reached at the depot. Peake discloses an entirely different arrangement. Standing alone, and according to the witnesses full credibility, Boss would have the preponderance of the evidence in his favor. But the conversation at the depot is not all there is in the record to explain the transaction. The agreement culminated at the bank. We have in what took place there physical facts, which in their evidentiary character are potent, and scarcely to be disputed. In short, Boss assembled his funds and placed them in the bank to his credit, so that he could draw against them. Thereupon he drew his check to the order of Peake, and delivered it to him. At the same time, Peake's stock was assigned in accordance with their understanding, and thus the transaction was closed. Concretely, this was a culmination of the entire agreement. Nothing whatsoever was reserved respecting a dissolution of the corporation. Boss had acquired the stock, and, he being the owner of the other half of the stock, the corporation was in his hands, to do as he liked with it—to dissolve it, and wind out the business in which it had been engaged, or to continue it as a going concern.

In this connection, it should be recalled that the records show that Peake tendered his resignation as secretary, treasurer, and director of the Boss & Peake Automobile Company on May 31st, to take effect as of that date. This was accepted on the same day, at a stockholders' meeting, in which Boss represented 298 shares of stock, and McRell was elected a director in Peake's stead. Peake may have known, and must have known, that Boss and McRell intended forming a copartnership and taking over the assets of the corporation; but in this he was not concerned. He loaned the copartnership $9,600, and accepted its paper, taking certain automobiles as security. This was to enable Boss to assemble the fund with which to pay him. Boss drew against the amount, when he drew his check to the order of Peake, in payment of the purchase price of the stock.

It is doubtful whether, at the exact time of the transaction at the bank, the certificate had been executed designating the name and style of the copartnership; for Boss and McRell both testify that they repaired immediately to the office of Mr. Logan for the purpose of having that done. That is of minor importance, however, as it is not disputed that they had previously agreed between themselves to enter into such relations.

Much has been said in the testimony respecting numerous satisfactory estimated statements, which Boss claims were made from time to time, which enabled the parties to ascertain as the business progressed very closely what profits had accumulated. Peake denies that such statements of the business were frequently made, or at all. In this he is supported by Murphy, the bookkeeper. This dispute, however, is of little importance, as Peake does not deny that he kept himself fairly well posted touching the accumulation of profits during the pendency of the business of the company. This enabled him in his estimate to put a satisfactory price on his stock.

What we have of the books consists in a measure of trial balances.

There was never any inventory of the assets made, and, of course, Peake never had any knowledge of such, nor any hand or part in it. The process of dissolution was simply for the C. L. Boss Automobile Company to take over the business and assets of the Boss & Peake Automobile Company, in which Peake, having resigned as director and assigned his stock to Boss, had no part. The whole proceeding was thenceforward directed by Boss and McRell. The Boss & Peake Automobile Company, through Boss, its president, and McRell, its secretary, passed all of its property by bill of sale to the C. L. Boss Automobile Company, a copartnership; but the business of the corporation was not closed until about the 19th day of June, 1917, nor was the corporation finally dissolved until the 22d.

Referring to the affidavits of Boss and McRell, made at the time the tax was assessed, it will become apparent that Boss then had a somewhat different theory of the supposed division of the assets between himself and Peake; the theory being that there was an equal division of the entire assets of the corporation. McRell concretely states what was then done, from Boss' standpoint, as follows:

"That on said 1st day of June, 1917, a division of the physical assets of said Boss & Peake Automobile Company, a corporation, was had and made by ascertaining from the periodical statement, kept and maintained by said corporation, of the value of all the physical assets, including accounts and estimated profits, and by such division E. W. A. Peake received in cash the full sum of $26,137.15, which was one-half of the value of said assets, as above set out, together with the value of a certain desk owned privately by E. W. A. Peake and valued at $53.50; in other words, E. W. A. Peake received one-half of $52,167.30, which was $26,083.65, plus $53.50, making $26,137.15."

Boss says, speaking of the alleged agreement of May 21st, that the assets "were to be divided, 50 per cent. going to myself and 50 per cent. going to Mr. Peake." His testimony now shows that the total assets of the corporation were, on June 1st, $52,746.64, of which $22,746.64 was carried in the profit and loss account; that $10,000 of this amount was paid to Peake, $11,373.32 credited to himself, and $1,373.32 passed to surplus account and subsequently divided between himself and McRell, according to their several interests in the copartnership; so that there could not have been a physical division of assets, as asserted by Boss and McRell in their affidavits addressed to the revenue officers. Nor was there an equal division of such assets. There was never an inventory made up of the entire assets, brought down to the date of the culmination of the transaction, and the parties did not deal with reference thereto when they closed their negotiations. This change of position by Boss and McRell is of significance in weighing the testimony pro and con touching the controversy, and in determining what was the real agreement of the parties.

The income tax was not assessed against the corporation until May 1, 1920. Peake had no knowledge of it until he received information thereof from the office of the collector of internal revenue. The tax is referable in small measure to the act of September 8, 1916 (39 Stat. 756), but by far the greater proportion to the act of October 3, 1917 (40 Stat. 300). The later act, although passed subsequent to the time the business was conducted by the Boss & Peake Automobile Company,

is retroactive in its effect. It is claimed by Boss that, at the time of the transaction between him and Peake, the tax was not in their minds, and that therefore it did not enter as an element in their agreement; that only the current liabilities were assumed by him. Some of the tax, however, was assessable against the property; that is, under the act of September 8, 1916. The parties were presumed to know of this, and, of course, they were required to take notice of the power of Congress to enact a retroactive measure of the kind denoted by the act of October 3, 1917. It is a matter of moment, also, that the stock had a value beyond the mere book value of the assets of the corporation. The enterprise had proven to be profitable. On an investment of $30,000, the company had earned more than $22,000 in five months, and the good will must have been of considerable worth. Peake gave up his interest in this when he parted with his stock.

Considering all the testimony, and the manner in which the parties have treated the subject-matter of their adjustment, I am impelled to the conclusion that the agreement consisted in the sale by Peake of his capital stock in the Boss & Peake Automobile Company to Boss for the lump consideration of $25,000, it being understood that Peake should be paid the salary due him, and compensation for the furniture, which was his individual property, and that it was not for a dissolution of the corporation and a division and distribution of its physical assets between them. As between Boss and Peake, therefore, the former is liable for the entire tax, and the latter should not be held accountable for any of it.

[2] Now, as to Peake's liability to the government, it is not questioned that the United States may sue, as it has done, for the tax. The tax provision of the act of October 3, 1917, is retrospective as of January 1, 1917, but the act is not unconstitutional because of that provision. Brushaber v. Union Pacific Railroad Co., 240 U. S. 1, 36 Sup. Ct. 236, 60 L. Ed. 493, Ann. Cas. 1917B, 713, L. R. A. 1917D, 414. As is said in Brady v. Anderson, 240 Fed. 665, 667, 153 C. C. A. 463, 465:

"The tax is against the citizens and residents of the United States personally. They are chargeable in respect to income received by them. The statement that the tax is upon this income does not create an obligation in rem. It is only a way of saying that the owner is taxable with reference to the income."

So is a corporation chargeable with the tax, as a person is charged, although the tax is upon its income.

[3] The government bases its remedy against Peake upon the hypothesis that he was a stockholder in the Boss & Peake Automobile Company when and at the time it was dissolved, and that he came into possession of a portion of its property in the way of distribution sufficient in value to pay the remainder of the tax due, and therefore that he is liable. In other words, it is argued that Boss and Peake received the then existing assets of the corporation, and that it is immaterial to the government as to what form the distribution took, so long as the assets of the corporation were actually depleted by the stockholders, whether Peake received his portion in form as part of the purchase price of his stock or as a distribution of the assets.

It must be conceded that where, upon the dissolution of a corporation, its assets are distributed among the stockholders, the stockholders become liable to the creditors of the corporation, at least to the extent of the property received by them. This is referable to the so-called trust doctrine. As we have seen, Peake sold his stock to Boss. Having the stock, the Boss & Peake Automobile Company, through Boss, as president, and McRell, to whom was assigned one share of stock as secretary, by bill of sale, sold and transferred the entire assets of the corporation to the C. L. Boss Automobile Company. The sale was in due time ratified by the stockholders; Boss representing 298 shares of the stock at the time. In all this Peake had no part.

Availing themselves of the corporation assets, Boss and McRell were enabled to, and did, organize the C. L. Boss Automobile Company, a copartnership; Boss giving to McRell such interest only as McRell was able to purchase and pay for. The copartnership having been organized and established as an entity capable of holding the assets of the corporation transferred to it, Boss and McRell were so equipped that they thereupon, through the usual formalities, dissolved the corporation at a time when it possessed no assets for distribution. Again, in neither the formation of the copartnership nor the dissolution of the corporation did Peake have a hand. The logical sequence was that Boss acquired all the assets of the corporation, and utilized them as his capital in the copartnership, and this by reason of the fact that he had acquired Peake's stock. Otherwise, he could not have accomplished his purpose, simply because Peake would not have allowed it. Applying the trust doctrine, it would follow that Boss, and not Peake, would be liable for the debts of the corporation, and with them the tax in question. Aside from this, it must be borne in mind that Boss assumed the liabilities, and Peake was to be relieved of them.

In Pierce v. United States, 255 U. S. 398, 41 Sup. Ct. 365, 65 L. Ed. 697, the Waters-Pierce Oil Company sold and transferred all its property to the Pierce Oil Corporation and the proceeds were distributed among three stockholders. Suit was instituted against the Waters-Pierce Oil Company and the three stockholders for the amount of a sentence imposed against the Oil Company. The bill was dismissed as against the Oil Company and the government was awarded a decree against the stockholders. In the case of Martin v. City of Lexington, 183 Ky. 714, 210 S. W. 483, all the owners of stock in Curry, Brown & Snyder, a corporation, sold and delivered to E. L. Martin their shares of stock, which transaction he attempted to construe as a purchase of the assets. After the sale, Martin took charge of the business, and commingled his merchandise with that taken over. He was held liable for taxes assessed against the corporation's stock of merchandise, in a suit to recover against him as a stockholder. These cases are illustrative. Both proceeded under the trust doctrine for recovery; not otherwise. The Martin Case is of marked analogy to the one at bar. Martin claimed to have purchased the assets, and not the stock; but the court held otherwise.

[4] It is said that Peake depleted the assets of the corporation, and that for this he is liable. What he did, so far as the record shows, was

to loan the C. L. Boss Automobile Company $9,600, and take as security for the payment thereof mortgages on certain cars, which were previously a part of the assets of the corporation. The money was advanced to the copartnership by check, and by it turned over to Boss, who utilized it in paying Peake in part. The copartnership was left, as we have seen, owing Peake the amount of the $9,600. The result was that a part of the previous assets of the corporation, but now the property of the copartnership, was thus incumbered in favor of Peake. Another circumstance is that Boss borrowed $8,537.15 from the corporation on his note, and with this paid Peake, in part, the consideration for which he sold his stock.

Whether this amounted to a depletion of the assets of the corporation may be questioned, even though the property had not passed to the copartnership. In the one case, the entity had the money, which was a lien upon the cars hypothecated, and in the other it had the note of Boss, the equivalent, supposedly, of the money withdrawn from its coffers. But, however that may be, a mere depletion of assets, unless accompanied by fraud, with the view of overreaching creditors, does not afford basis for an equitable action to recover against the party receiving the assets withdrawn. Dividends are paid out every day, which action in itself is a depletion of assets accumulated; yet no one thinks, when the corporation has gone into liquidation or insolvency, of suing to recover such dividends. So in the present case, unless the supposed depletion is referable to the so-called trust doctrine, which it manifestly is not, the government cannot have remedy on that account. I was impressed at the trial that, Peake having received money, which came from the corporation, sufficient to cover the tax due, he would be rendered liable thereby; but, from the foregoing considerations, obviously this cannot be the rule.

The government will have a decree against C. L. Boss for the amount of the tax due, with interest and penalty. The bill of complaint will be dismissed as to E. W. A. Peake, and the cross-bill of Boss & Peake Automobile Company and C. L. Boss against Peake will also be dismissed, with costs to Peake against Boss.